Moncure, P.,
delivered the opinion of the court.
The court is of opinion that the article of agreement, marked • “Exhibit B,” and filed with the appellant’s bill, was a valid a.nd binding agreement between the parties thereto, Mary A. Mackey, the intestate of the appellee William F. Johnston, and the appellant, Samuel C. Mackey, for the sale of right of dower therein described of the said Mary A. to the said Samuel C. Mackey, for the sum of eleven hundred dollars, payable as therein mentioned. It has all the indicia of a valid and binding *agreement and was manifestly intended by the parties so to be. It commences thus: “Article of agreement made and concluded this ninth day of November, 1870, between,” &c„ sets out the names of the parties, thé description of the property sold and how it was derived, the consideration of the sale and how it is to be paid, that the title is to be .conveyed when the purchase money is fully paid, the last instalment of which was payable on the first of November, 1871, about a year after the daté of the agreement; and it concludes thus: “for true and faithful performance of which we bind ourselves, our heirs, executors, administrators and assigns the day and year above written.” Signed, “Mary A. Mackey, [Seal,] Sam’l C. Mackey, [Seal.]” The instrument was manifestly intended for a specialty, but the word “seal” not being embodied in the instrument, it is at least doubtful whether it be not a mere simple contract. It-was so treated in'the argument and will be so treated in this opinion, as it is immaterial whether it be a specialty or a simple contract, in the view we take of this case. It may be as valid and binding in the one alternative as the other.
The instrument was drawn by the father of Mary A. Mackey, who was not a lawyer, and at his house in the country, where the parties then were, about fifteen miles from the residence of any lawyer, or at least of the lawyer who was to be consulted on the subject. The agreement being a very important one,-it was intended by the parties 'that it should, as soon as convenient, be put in perfect form by the agency of a lawyer, and it was accordingly agreed by them that three days thereafter, they would meet at the office of a certain lawyer in Lexington and have a new instrument drawn by him in perfect form, to be then executed by them, when bonds would be drawn and and executed for the deferred *instal-ments of the purchase money. Mr. Mackey accordingly attended at the time and place named, but Mrs. Mackey did not. She did not fail, however, from any unwillingness to comply with her engagement in any respect. On the 10th of November, 1870, the day after the date of the agreement, she wrote a letter to Mr. Mackey, marked “Exhibit C,” and also filed with the bill, in which she gave the reason for her not being able to meet him according to their first appointment, but said she would try and go down on Wednesday next thereafter, or Saturday, and requested him to “have the article ready,” saying she would “sign it,” also his bonds. She did not attend on either of the two latter days named, being prevented by her engagements from doing so, and she was taken sick and died within less than a month after the date of the agreement, without having during that period executed any other agreement on the subject or had one presented to her for the purpose, or gone to Lexington, or seen the said Samuel C. Mackey, so far as appears from the record.
The result of her unexpected death, at only thirty-eight years of age, was very unfortunate to Samuel C. Mackey, supposing the agreement to be valid and binding. It would have been just as unfortunate, indeed, precisely the same in effect, if the agreement had been, if it was not, perfect in form as well as substance. It would have been written by a lawyer if one had been present when it was written. If it had been so written and 'had been perfect in form and substance, nobody can 'doubt that he would have been bound and liable to pay the whole consideration money, although by the death of Mrs. Mackey, her dower interest, which he purchased, would have ceased at once and *391 forever. The agreement was one of great hazard in its very nature..If she should live to an old age, it would be very advantageous *to him; if she should die very soon, as she did, it would be very much to the contrary. He made the agreement with his eyes open, in full view of the risk. Her health, no doubt, was then very good, and her death in any short time very unlikely; but she did, very unexpectedly, die in less than a month after the date of the agreement, and he cannot complain of the effect of her death upon the agreement if it was valid and binding. The only question, therefore is, Was it valid and binding?
That the parties intended to make it so, there cannot be a doubt. Else why enter into it at all? Why express it in such formal and significant language? “Article of agreement made and concluded this 9th day of November, 1870,” is the language used in the commencement; not “memorandum of an agreement intended, or contemplated to be hereafter made and concluded.” Why set out therein so minutely the names and residences of the parties, the property intended to be sold and conveyed, the price intended to be paid for it, the instalments in which and the times at which such price was to be payame, and the time when the conveyance was to be made? and why conclude il in these formal and significant words: “for true and faitliiul performance of which, we bind ourselves,, our heirs, executors, administrators and assigns, the day and year above written?” and why subscribe to it, not only the names, but the seals of the parties? All these are strong indicia of intention as to the binding nature and effect of the instrument apparent upon its face. There are also strong collateral indicia of such intention in the circumstances surrounding its execution. 11 was drawn in duplicate, and one of the duplicates was delivered to and kept by each parly. A part of the purchase money was paid in hand at the date of the agreement, to-wit: one hundred and ninety dollars, and a receipt therefor was endorsed on the instrument, *or written under it, and signed by “Mary A. Mackey.” There can be no doubt but that there were such duplicates. The original agreement was drawn by the father of Mrs. Mackey, and yet the one exhibited with the bill is in the ír1 tidwriting of Mrs. Mackey, and was signed by the parties respectively, showing that she c' pied the original at the time it was drawn, and that the two drafts were then executed and interchanged by the parties. Nor can there be any doubt but that there was, at the time of making the agreement, such a part payment as is indicated by the said receipt Otherwise the difference between $1,100, the total amount of the purchase money, and $905, the total amount of the deferred instalments thereof, cannot be accounted for! Samuel C. Mackey does not produce the duplicate of the agreement in his possession, to show that there is no such receipt upon it; and the presumption is that there is such a receipt upon it. That receipt was written and signed by Mrs. Mackey, and she died within less than a month after the date -of the agreement. She had no motive to fabricate a receipt. On the contrary, her motive, if she had any, was the other way, to-wit: to claim the one hundred and ninety dollars as applicable to the payment of rent due to her, if any such rent was so due to her, by Samuel C. Mac-key, and to claim the balance of the purchase money which would remain due to her after deducting the amount of the deferred instalments, if such balance was not paid as aforesaid. There is still the small sum of five dollars to be accounted for to make up the whole amount of the purchase money; but that was no doubt retained by Samuel C. Mackey to purchase the bridle mentioned in her letter to him, marked “Exhibit C,” and filed with his bill. There is no evidence in the record tending to show that there was due to her by him at the date of the said agreement the *sum of $190, or any other sum on account of rent of her dower interest. Neither of the parties manifested, and doubtless neither of the parties felt, the slightest disposition not to carry the said agreement into full effect from the time of its date down to the lime of her death; but on the contrary, both parties, during all that time, contemplated the full execution of the agreement. This view conclusively repels the idea of such a fabrication by her of the receipt as is before mentioned.
Nothing is more common or natural than for parties unlearned in the law, when they enter into an important contract which they desire to be binding as soon as possible, and there is no lawyer near enough to be employed to draw the instrument immediately, to draw it, or have it drawn, as well as they can under the circumstances, to make it binding at and from the time of entering into such contract, with the understanding and agreement, however, that the instrument will be submitted to a lawyer agreed upon by them, at some convenient time af-terwards, who is to re-write it, so as to make it valid and binding if it be not already so, or put it in better form if deemed proper and desirable by him. And that is precisely what seems to have been the intention and object of the parties in this case. If Mrs. Mackey, after entering into the agreement aforesaid, had been offered for her dower interest twice the amount which Samuel Mackey had agreed to pay for it, can anybody suppose that she would have had a right to disregard that agreement and enter into one with the person making such higher offer?
Certainly the parties intended that their agreement should be binding if it was in such form as to have that effect. And it certainly is in such form.
There is nothing in conflict with what we have said in any of the books or cases cited by the learned counsel *for the appellant. We have ex-imined them as far as we have had access to them, and we have had access to nearly all, and we take the meaning of the rest from the account given of them in the said counsel’s brief. In the case of Mackenzie v. Roper, 2 Strobhart *392 308, which we have not seen, it appears to have been decided that it is considered no contradiction of a deed to show when it became a deed. Certainly not. The doctrine of escrow, so well established and understood, is based on that theory. In Johnson &c. v. Baker &c., 4 B. & A. 440 (6 Eng. C. L. R. 479), cited in 2 Rob. Pr., new edition, p. 20, both of which we have seen, the case was one of escrow, and the principle on which it was decided is a familiar principle. The same may be said of Bowker v. Burdekin, 11 Mees. & W. 127; and also of Hicks &c. v. Goode, 12 Leigh 479. It is true, as stated in 2 Rob. Pr. 338, that “there is of course a material difference between an unaccepted proposal and a binding agreement; between negotiations preparatory to an agreement, and the agreement itself. Head & al. v. Providence Insurance Company, 2 Cranch 127, 1 Curtis 459. Sometimes the meaning is that there shall be no binding engagement until a written contract is entered into and signed by the parties. Governor &c. v. Petch, 28 Eng. Law and Equity, 470. The statute of frauds is based upon that hypothesis, and the parties may, and often do, upon the same principle, manifest an intention not to bind themselves until they put their agreement in writing and sign it. Until then the locus penitentiae exists. In the case cited from 28 Eng. L. & E. R., it was expressly stipulated, that “all contractors would have to sign a written contract after acceptance of tender.” There was an offer and acceptance, and an appointment made in pursuance thereof, which, however, the intended appointee immediately declined before there *was any written contract. It was held that the transaction amounted merely to a proposal for a contract, and that there was no binding contract until a written agreement had been signed. There can be no doubt about the correctness of that decision. In Strickland v. Turner, 7 Exch. R. 206, W. H. & G. 208, which is relied on by the learned counsel as closely in point to the present case, the abstract of the decision is correctly stated thus, at the caption of the report of it:
“E- H. L., who resides at Sydney, New South Wales, being entitled to an annuity for his life, assigned it, in 1847, to certain trustees to dispose of it for his benefit. The plaintiff entered into a correspondence by letter with the trustees, upon the subject of the purchase, and from the various letters which passed between the parties it appeared that the terms of the purchase were not finally determine on and settled until the 28th of February, 1849. Upon the 6th of that month the annuitant died. The purchase money was paid by the plaintiff in 'ignorance -of the fact, and was ultimately received by the executrix of the deceased— Held: That as, at the time of the purchase of the annuity, it had ceased to exist, the plaintiff was entitled to recover back the whole of the purchase money from the executrix, on the ground that the purchase money had been paid without consideration.”
The principle of this decision is very cb-vious, and does not at all conflict with the views we have before expressed of this case. As Martin, Baron, said in Strickland v. Turner: “If a chattel is sold and at the time of the sale the chattel does not exist, the contract is not binding upon the purchaser.” And as Pollock, C. B., who delivered the judgment of the court in that case, said: “Until the day was fixed, up to which the annuity should continue to be paid, it is impossible to ascertain what *sum of money -was to be paid and received” for the purchase of the annuity. “Now, this was never ascertained or settled in the lifetime of the annuitant. The annuity, therefore, still continued to belong to Lane,” the annuitant, and never “passed to the purchaser till this was ascertained and the bargain finally arranged between them. When this was done, the annuity became the property of Strictland, and the money the property of the vendors. But then there was nc annuity in existence. The money, therefore, which was paid was paid wholly without consideration, and may now be recovered back,” &c. The case of Franklin v. Long, 7 Gill. & Jno. 407, cited in a note to that case, seems to be to the same effect. The Nisi Prius decision of Best, C. J., in Routledge v. Grant, 3 C. & P. 267, 14 E. C. L. R., 298, also cited by the counsel for the appellant, depends upon a very plain principle, not at all in conflict with our views of this case. There, a proposal was accepted with a variation, when it was withdrawn. Afterwards the acceptor said his acceptance with a variation was by mistake, and he then accepted the proposal as it was made, according to its terms; but the latter acceptance was held to be too late.
The books and cases cited by the learned counsel for the appellee, sustain the views we have expressed. It is unnecessary to notice all of them here. In Fry on Specific Performance of Contracts, section 344, that author says: “But the mere fact, though appearing on the paper, that a more formal agreement is intended to be drawn up, will not prevent a paper duly signed and containing all the terms from being an agreement any more than will a reference to deeds thereafter to be executed.” Citing in notes the cases of Gibbons v. Northeastern Metropolitan District Asylum, 11 Beav. 1; and Skinner v. McDowell, 2 DeG. and Sm., 265; and in section *175 he says: , “Nor will the court consider a new term to be introduced by the circumstances that the acceptance proceeds to treat of the way in which the contract is to be carried out; as for instance by referring to a formal agreement that was to be made.” Citing in a note the same cases above referred to.
The books and cases cited by the counsel for the appellant in their reply to the argument of the counsel of the appellee, do not, in our opinion, vary the result. In Addison on Contract, page 370, section 243,,it is said that “a document purporting to be a contract signed by the parties is not necessarily so, and it is competent for either of the parties to show by parol evidence that it. *393 was not their intention in signing it that it should operate as a contract, and that the real contract between them was not in writing.” That is very clear, but it is clearly not this case. In the same book, page 38, section 20, the author says: “Where a proposal or tender is accepted, subject to the terms of a contract being arranged and drawn up for signature, there is no concluded bargain until the terms have been arranged and a written contract executed.” The same may be said of this as has been said of the next preceding quotation from the same author. In this case the terms had “been arranged and a written contract executed.” In 3 Parson’s on Contract, pp. 351, 389n, 353, 393, 394, we see nothing in conflict with our view of ;his case, and nothing that need be slated here. We cannot see the application of the case of Moore's adm’r v. Fitz Randolph &c., 6 Leigh 175, 183, to this case.
The court is further of opinion, that if the article of agreement aforesaid was not a valid and binding agreement between the parties thereto as aforesaid, the appellant was entitled to defend himself at law on that ground, under the general issue in the action of assumpsit brought *by the appel-lee against the appellant upon that agreement. And the judgment recovered by the appellee against the appellant in that action is a conclusive bar of any right of the appellant to relief in the suit in equity brought by him, from the decree rendered in which the appeal in this case was obtained. The remedy of the appellant being complete at law, he was therefore entitled to no relief in equity upon familiar principles.
The case of Tapp’s adm’r v. Rankin, 9 Leigh 478, cited in the brief of the appellee’s counsel, fully sustains the position, which is also sustained by other authorities too numerous to be cited. The demurrer to the bill ought therefore to have been sustained instead of being overruled. But the court below did right in dissolving the injunction and dismissing the bill with costs.
The court is therefore of opinion that there is no error in the decree appealed from to the prejudice of the appellant, and the said decree is therefore affirmed.
Decree affirmed.